HARRY E. PERRY, Appellant, v. GEORGE W. ADAMS et al.,
Appellees.

GERMAN BANK OF WALNUT, Appellant, v. GEORGE W. ADAMS
et al., Appellees.

HOMESTEAD: Acquisition and Establishment—Equitable Owner—
1 Pre-existing Liabilities. The acquisition of property under *equitable* ownership and the actual use of said property as a home renders said homestead invulnerable to attack for debt accruing subsequent to such acquisition and use, and prior to the acquisition of the legal title. Evidence, somewhat unusual, reviewed and held sufficient to sustain the trial court in holding that equitable ownership was shown.

HOMESTEAD: Liabilities Enforceable Against—Pre-existing Liability
2 ity—Burden of Proof. He who seeks to subject the admitted homestead of a debtor to the satisfaction of judgments against a debtor has the burden to show that the indebtedness evidenced by the judgments accrued prior to the acquisition of the homestead. Section 2976, Code, 1897.

*Appeal from Pottawattamie District Court.*—J. B. ROCKA-
FELLOW, Judge.

MONDAY, MAY 14, 1917.

ACTION in equity to subject certain property to the payment of certain judgments held by the plaintiff. Defense, that the property is the homestead of the defendant. Reply, that the homestead character did not attach until after the debt accrued on which the judgments were founded. District court dismissed plaintiff's petition. Plaintiff appeals.—*Affirmed.*

*Preston & Dillinger,* for appellants.

*Turner & Cullison* and *J. J. Hess,* for appellees.

GAYNOR, C. J.—By agreement of parties,

**1. HOMESTEAD:** these two actions are argued and submitted
acquisition and
establishment: together.   Each action is brought to subject
equitable
owner: pre- certain real estate to the satisfaction of cer-
existing liabili-
ties. tain judgments.   The contention of the de-
fendant is that the property sought to be sub-
jected to these judgments is and was his homestead, and
therefore exempt under the statute.   The contention of the
plaintiff is that the defendant did not acquire title to the
property, and that the homestead character, if any, did not
attach, until after the debts had accrued upon which the
judgments were rendered.

The facts in the case are substantially as follows: The
plaintiffs each secured judgments against the defendant
George W. Adams on the 7th day of February, 1913; the
German Bank, on May 2, 1913.   The judgment in the Perry
case was founded on a note executed by George W. Adams,
dated November 31, 1909.   The judgment in the German
Bank case was on three promissory notes executed by
George Adams, dated December 7, 1909.   There is no ques-
tion raised in the case over the judgments or the date of the
notes upon which the judgments are founded, nor as to the
time when the indebtedness accrued on which the judg-
ments were founded.   Section 2976 of the Code of 1897 pro-
vides:

"The homestead may be sold on execution for debts con-
tracted prior to its acquisition."

The contention of the plaintiffs is that the defendant
George W. Adams acquired his title and ownership to the
property in question by devise under the will of one Alex-
ander Adams, about the month of October, 1911, and that
the homestead character of said property claimed by defend-
ant did not attach thereto until the month of September,
1911.   The contention of the defendant Adams is that the
homestead character attached to, and he became invested

with a right of homestead in, said property long before
the debts were contracted on which the judgments were
entered. He claims his exemption under the provisions of
Section 2972 of the Code of 1897, which reads:

"The homestead of every family, whether owned by the
husband or wife, is exempt from judicial sale, where there
is no special declaration of statute to the contrary."

The question presented here for our consideration is:
Did the homestead rights of Adams in the property in con-
troversy attach after the debts were contracted upon which
these judgments were entered?

2. HOMESTEAD: liabilities enforceable against: pre-existing liability: burden of proof.
That the property in controversy was
the homestead of George W. Adams at the
time these actions were commenced, is not
disputed. The burden, therefore, rests up-
on the plaintiffs to show that the homestead
was acquired, and the homestead rights attached, after the
debts were contracted upon which the judgments were en-
tered. The evidence is brief, and from it we gather these
ultimate facts:

George W. Adams, the defendant, was raised in the
home of one Alexander Adams and wife, but was not their
child, nor was he ever adopted by them. Alexander Adams
moved from Illinois to Iowa when the defendant was a
small boy. He settled on a farm of 280 acres, about 4
miles from the town of Walnut, and was there engaged in
farming and stockraising until 1887, when he left the farm
and moved to the property in controversy. He lived in this
property with his wife until 1900, at which time she died.
After the death of his wife, he continued to make the prop-
erty his home until his death, in 1911. Up to the time Al-
exander and his wife moved to this home, defendant was un-
married, and resided with them on the farm place, and, we
take it, was treated in all respects as a son. It appears,
however, that, at the time the old folks moved from the farm

to this property, the defendant was contemplating marriage. Defendant remained on the farm after his marriage until 1896. One W. S. Packard was engaged, among other things, in the real estate business in the town of Walnut. His testimony discloses that he had the property in controversy, known as the Green property, listed for sale; that he talked with Mr. and Mrs. Alexander Adams about buying it in the year 1887; that he took them and showed them the property; that Alexander said to him that he didn't know about buying it; that George (meaning this defendant) was wanting to get a place; that one day, about this time, the defendant drove into town, and this agent told him, "Now is the time for you if you want to get the Green property, to take it in. You can get it for $1,000;" that defendant then said he would take it, and paid $100 earnest money to bind the bargain; that he afterwards saw Mr. and Mrs. Alexander Adams and told them that George (meaning the defendant) had bought the property. Alexander said he was glad of it, it would make a good home for him; that later the deal was closed, and the title taken in the name of Alexander Adams. This ended the connection of this agent with the transaction. His further testimony discloses that he had several talks with the elder Adams with reference to the purchase of property in town; that they were talking about purchasing property in town.

George Adams' testimony discloses that he lived at the place in controversy and on this farm with the elder Adams ever since 1872; that he went to this home in Walnut in 1896, and stayed there continuously since then. He says:

"I first learned of this property in 1887, at the time the purchase was made. I was then contemplating marriage. The old folks were talking of leaving the farm, and had several properties in view. One night in August, 1887, Mr. Packard stopped me on the street and said to me, 'Do you want the Green property?' I told him I didn't know

whether the folks wanted it or not.    Packard told me that
he had a party who had offered $950 for it.    I said to him,
'Then I will take it,' and paid him $100 and got a receipt.
The money paid was my own money.    Further payments
were made on the property."

Upon this point, he testifies:

"I was married in 1887.    Alexander Adams' notes were
given to Mr. Green for the balance of the purchase price of
this property.    The title to the property was taken in the
name of Alexander Adams.    It was taken on an understand-
ing between me and him that Green was to take notes given
in the name of father (Alexander Adams).    Mine wouldn't
go at that time.    No one ever repaid me the consideration
furnished by me for the payment 'on this homestead.    From
1896, the time I moved from the farm, I have lived in this
property continuously.    *    *    *    The old folks left the
farm in 1887 and went to this home in Walnut.    I remained
on the farm.    At the time the property was bought, the
old folks were still on the farm.    I was married before the
deed was made.    When the old folks left the farm, the
stock and implements were left on the place under what
you might call a family partnership arrangement.    We kept
everything, then divided the proceeds sometimes, and some-
times we used what might be his, and sometimes we used
what might be mine.    I used my own judgment in running
the farm.    This arrangement continued until 1896.    The
arrangement for running the farm was made in the fall of
1887.    Father's stock and farm implements remained on the
farm during the time I occupied it.    In 1896, Alexander
Adams had a sale on the farm and I moved to town.    At
that time, the old gentleman and his wife were living in the
place in town, and my wife and I went there to live with
them.    From 1887 to 1896, the old folks. had the place in
town furnished after the fashion of old people that move
to town.    They had their own furniture during that period.

Mrs. Alexander Adams died in 1900. From 1896, the time I moved to town, until 1900, I was on the road traveling with a live stock commission house with headquarters at Walnut. My wife was at the home in town regularly after mother died. From 1896 to 1900, my wife was at home part of the time, and part of the time at her folks. My first wife and I were divorced in October, 1905. During the seasons of 1896, '97 and '98, my wife helped her folks on the Perry farm. I married my present wife in 1909, and took her to my father's home at that time. Father's household goods and furniture continued to remain in the home until his death. During the time my second wife was at father's home, I was away about three fourths of the time."

It further appears that Alexander Adams paid all the taxes on this home property until the time of his death; that George Adams never paid any taxes during the years 1900 and 1911, inclusive. On December 5, 1910, Alexander Adams executed his will, in which he bequeathed to George W. Adams the house and lot in controversy, with the furniture and books therein. This will was duly admitted to probate in September, 1911, soon after the old gentleman's death. It is the contention of the plaintiffs that this record discloses that the property in question was the property of Alexander Adams at the time of his death; that Alexander occupied the property as his home, with his wife, until her death in 1900, and continued thereafter to occupy it as his home, until his death in 1911; that the defendant acquired no interest in the property upon which he could predicate a homestead right until he acquired title through the devise made in Alexander Adams' will in 1911; and that this was after the indebtedness had accrued upon which plaintiffs rely.

This record shows: That in 1887, defendant purchased the property; that he paid $100 down to bind the bargain;

that thereafter, under some arrangement between him and Alexander Adams, Alexander's notes were taken by the owner for the balance of the purchase money, because, as he says, at that time his notes were not considered good for that amount; that, under some arrangement between them, the deed was then taken in Alexander Adams' name, for the purpose of securing Alexander. This last is a reasonable inference from the whole record. This home place was purchased when the defendant and his foster father and mother were residing upon the farm. The defendant was contemplating marriage. Thereafter, the defendant married, and some arrangement was made between him and his foster parents that resulted in their going to town and entering into the possession and occupancy of this property, and his remaining on the old farm place. At this time, there was also some arrangement between them for a division of the profits of the farm. What that arrangement was does not appear, and what division was in fact made does not appear, but the defendant says, however, that out of the proceeds of this farm he paid the balance of the purchase money; that this was his own money; that he continued to occupy and work the farm until 1896, then removed to this place in Walnut, and continued thereafter to occupy it as his home until the death of Alexander Adams, and that he was still occupying it at the time this suit was brought.

We think this record discloses the following ultimate facts: That the defendant purchased this property from Green, through Packard, in 1887; paid $100 down to bind the purchase price; that the purchase price was $1,000; that Alexander Adams, his foster father, gave his notes to secure the balance of the purchase price; that, to secure him, for so doing, under some arrangement between him and the defendant, the legal title was taken in the name of Alexander Adams; that the balance of the purchase price, as

evidenced by the notes of Alexander Adams, was subsequently paid by this defendant to the grantor, Green; that, as against the defendant, Alexander Adams held the legal title only as security; that defendant was in fact the owner of the property, subject to whatever rights Alexander Adams might have, in the event he were required to pay the notes, against the payment of which the legal title was taken in his name. When these notes were paid does not affirmatively appear, but we think it fairly appears from the record that they were paid prior to 1896; that, in 1896, the defendant, with his wife, entered into the possession of this property as his home; that it has been his home ever since.

As militating against this finding are the facts appearing in the record, that Alexander and his wife entered into the possession of this home immediately after its purchase and continued to occupy it until their deaths; that Alexander Adams paid the taxes during the years intervening between the year of the purchase and his death; that the title stood in the name of Alexander until his death; that Alexander Adams made this will in which he spoke of the property as his homestead. However, we do not think this is sufficient to call for a different conclusion. The district court found for the defendant. The relationship existing between Alexander Adams and the defendant accounted for much that might militate against the defendant's claim. The fact that Alexander Adams, upon his death, made this will giving the legal title to this defendant, emphasizes, rather than contradicts, the conclusion we have reached. The authorities are to the effect that the homestead right is not altogether dependent upon the legal title. One occupying under a bond for a deed may acquire homestead rights in the property occupied. One may acquire homestead rights in property even when the vendor retains the legal title as security for unpaid purchase money.

Homestead rights may be acquired in property to which the homesteader has only an equitable title. There may be a homestead right in the leasehold interest in real estate. A leasehold interest, in some cases, is held sufficient to support the homestead right. A homestead may exist as to property held in which there is only an equitable estate, as well as though it were held by legal title. Upon this point, see *Stinson v. Richardson,* 44 Iowa 373; *Thorn v. Thorn,* 14 Iowa 49; *Bolton v. Oberne,* 79 Iowa 278; *Hewitt v. Rankin,* 41 Iowa 35; *Pelan v. De Bevard,* 13 Iowa 53; *White v. Danforth,* 122 Iowa 403; *In re Estate of Ring,* 132 Iowa 216; *Foster v. Rice,* 126 Iowa 190.

Though the matter is not entirely free from doubt, we are constrained to say that, after a review of this record as written, and a consideration of facts inferentially appearing therein, we are not justified in disturbing the action of the district court, and therefore affirm the same.—*Affirmed.*

LADD, EVANS and SALINGER, JJ., concur.